Vene P. Stokes and Clerc J. Stokes v. Commissioner.
Stokes v. Commissioner
Docket No. 13628.
United States Tax Court
1949 Tax Ct. Memo LEXIS 152; 8 T.C.M. (CCH) 592; T.C.M. (RIA) 49152; June 20, 1949
*152 Credit for dependents. - Upon failure of proof that petitioners contributed more than half of the amount expended for the support of two grandchildren who lived under the custody and care of their mother during 1943, 1944, and 1945, held, that petitioners are not entitled to claimed credit for dependents. Income: Determination of. - In the absence of adequate records to show correct income from horse race bookmaking business, or of convincing evidence to show error, held, that respondent's method of determining income by resort to bank records and determination of living expenses is sustained, except that for the year 1943 he should use a calendar year basis instead of a 10 months' basis. C. Ellis Henican, Esq., 1116 Hibernia Bldg., New Orleans, La., for the petitioners. John P. Higgins, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: This proceeding involves income tax deficiencies in the amounts of $910.04 determined against each petitioner, individually, for the calendar year 1943, and $1,278.25 and $3,577.50 determined against the petitioners, jointly, for the calendar years 1944 and 1945, respectively. The issues raised by the pleadings involve the questions of whether respondent erred (1) in denying a claimed credit for dependency for one grandchild for the year 1943 and for two grandchildren *154 for each of the years 1944 and 1945, and (2) in increasing petitioners' marital community net income for each of the years 1943, 1944, and 1945 by including therein as additional unreported income certain amounts determined by respondent on the basis of the annual increase in Vene P. Stokes' net worth as reflected by his bank account plus estimated cash withdrawals from his business for living expenses. Findings of Fact Petitioners are husband and wife and residents of the City of New Orleans, Louisiana where, for a period of time including the taxable years, they have lived under the community property law as established in that State. For each of the taxable years involved herein petitioners filed their Federal income tax returns with the collector of internal revenue for the district of Louisiana. They filed separate returns for 1943 with each reporting one-half of their community income, and filed joint returns for 1944 and 1945. Petitioners have two sons, Vene, Jr., born in 1917, and Thomas, born in 1920. In 1937 Vene, Jr. married Yvonne Revol and they have two children, a daughter, Clerc, born in 1938, and a son, Kenneth, born in 1942. In August 1942 Vene, Jr. enlisted *155 as a private in the United States Army and served in that capacity throughout the years 1943, 1944, and 1945 and during a great part of that time he was overseas. During those three years Yvonne had the custody and care of her two children and she maintained a home for them at 1220 Cambronne Street, New Orleans, which was not far from where petitioners lived in a boarding house at 435 Barone Street in the same city. Yvonne received an allotment for the support of herself and children, the amount of which was at first $72 per month and subsequently increased to $100 per month. She paid from her allotment $25 per month as rent for the house and $10 and $11 per month during the winter season for light and gas, but much less during the summer months. Yvonne's allotment, which constituted her only source of income, was not sufficient during the years 1943, 1944, and 1945 to pay her entire expenses for rent, food, clothing, doctor bills, and medication for herself and children, all three of whom were in poor health. During the entire time that Vene, Jr. was in the Army, including the taxable years in question, the petitioners as a matter of necessity, as well as of natural love and affection, *156 contributed materially to the support of their grandchildren, Clerc and Kenneth Stokes, through their assistance in the purchase of food and clothing for them, and they also helped to pay for medical care for Yvonne and her children. Petitioners contributed particularly to the support of Kenneth during 1943 and to the support of both Kenneth and Clerc during 1944 and 1945. On their tax returns for 1943, the petitioners claimed a credit for the dependency of their grandchild, Kenneth Stokes, during the full twelve months. On their tax returns for 1944 and 1945, the petitioners claimed credits for the dependency of their grandchildren, Kenneth and Clerc Stokes, during the full twelve months of each year. In determining the asserted deficiencies respondent disallowed each of such claimed credits for dependents. Prior to and during the years 1943, 1944, and 1945 the petitioner, Vene P. Stokes, Sr., was primarily engaged as a horse race bookmaker. He operated an establishment, maintained by him in rented quarters at 3028 1/2 S. Carrollton Avenue, New Orleans, where he accepted bets on races run at about five race tracks located around the country, and he paid off at the track odds based *157 on information received over a direct wire service. Occasionally Stokes also took bets on other sporting events. Stokes usually employed a "board man" to chalk up on a blackboard the wire service information on races and at times he also employed a "ticket writer" to take customers' bets and sometimes he had three employees. Those clerks were paid varying amounts as daily wages for the days on which they actually worked. Occasionally, and for varying periods of time during each of the years 1943, 1944, and 1945, Stokes' bookmaking establishment was closed by the police because it was an illegal operation which depended for its existence and operation upon so-called political sanction by local authorities. Stokes' expenses connected with his business varied from time to time in amount and only the items of monthly rentals for the leased quarters and for the direct wire service remained more or less constant whether the business was in operation or closed down. During periods when the business was closed down Stokes considered living expenses and various general expenditures as constituting business expenses while standing by ready to operate as soon as permitted. When in operation Stokes' *158 volume of bets and his daily net winnings or losses varied materially and were determined by means of daily tally sheets on bets taken. During the years 1943, 1944, and 1945 Stokes did not maintain a regular set of books of account, but had a system whereby, in addition to the daily tally sheets, he personally made out weekly and monthly "recapitulation sheets" to record cash receipts and disbursements. Those recapitulation sheets were kept in one pocket size folder, 4 1/2 inches wide by 10 inches long by 1/2 inch think, and identical to another folder he always carried in his pocket as a container for his cash "bank roll". The folder containing Stokes' records was stolen from his home sometime in February 1946. During the years 1943, 1944, and 1945 Stokes carried in his pocket the folder containing his cash bank ron which was used in connection with his bookmaking operations and his regular practice of cashing the pay checks of customers and neighbors free of charge, and in addition thereto he also maintained a checking account which he treated as part of the cash on hand for use in his business. At such time as he paid off bets by check (rather than by cash as was usually done) *159 such payments were included in his recapitulation sheets in the same manner as bets paid off in cash. The checking account was also used for depositing cash sums in varying amounts of dollars; for depositing most of the checks he cashed as an accommodation and which were usually in varying amounts of dollars and odd cents; and for withdrawals for various expenditures including business expenses and also from time to time for the replenishment of his cash bank roll some portion of which was constantly being worked into and out of the bank account. At the end of each month and under a special arrangement with the bank, Stokes left his bank deposit book with the bank for a notation therein of his balance on deposit so that he could reconcile his bank balance with his cash bank roll. At the end of each year Stokes used his bank balance "as a criterion by which I would make my income report"; that is, at the end of the year Stokes treated as his profits the difference between the amount of his bank roll and the sum of that bank roll plus the balance in his bank account Stokes' checking account, in the name of "V. P. Stokes, Agent," was opened by him with a certain New Orleans bank on *160 December 8, 1941, by a deposit of $217.01 which was made in connection with his resumption of the bookmaking business at that time after a lay-off for several months. Frequent deposits in excess of frequent withdrawals during the period from December 8, 1941 to January 1, 1943 resulted in a bank balance of $1,757.82 on the later date. Stokes' bank balance at the beginning and close of each taxable year, his bank balance on November 3, 1943, and the net increase in his bank balance for the twelve months period in each taxable year, which resulted from his consistent practice of making frequent deposits and withdrawals during each month of each of those years in connection with the operation of his business, were as follows: Net Increase
Date
Bank Balance
per Year
Jan. 1, 1943
$1,757.82
Nov. 3, 1943
7,768.00
Dec. 31, 1943
4,541.40
$ 2,783.58
Jan. 1, 1944
4,541.40
Dec. 31, 1944
5,369.97
828.57
Jan. 1, 1945
5,369.97
Dec. 31, 1945
13,238.83
7,868.86
In the above tabulation the decrease in Stokes' bank balance as between November 3, 1943 and December 31, 1943 represented withdrawals to cover among other things losses on bets and the replenishment *161 of his cash bank roll. At the beginning of 1943 Stokes' cash bank roll amounted to approximately $5,000 derived from some undisclosed source, but which was neither earned by him in prior years nor borrowed. The amount of Stokes' cash bank roll was not reflected in any of the records he kept during the years in question and while, as above stated, some portion of the bank roll was constantly being worked in and out of his bank account through frequent deposits and withdrawals, there was no record as to what portion thereof, if any, was on deposit at any particular time during or at the end of each of the years 1943, 1944, and 1945. Petitioner Vene P. Stokes never filed an income tax return for any year prior to the taxable year 1943, because he allegedly did not have sufficient profits. Petitioners' 1943 and 1944 tax returns were purportedly made out on the basis of the records kept by Stokes, but their 1945 return was made out from memory after his records were stolen in February 1946. For the year 1943 petitioners filed separate returns, each reporting one-half of the community income as shown on Vene P. Stokes' return. Such return reported a net income of $4,058.01, consisting *162 of $1,500.19 salaries received by Mrs. Stokes from W.P.A. and Naval Supply Depot and the amount of $2,557.12 as net profits from Vene P. Stokes' business. Respondent determined that the difference between Stokes' bank balance of $1,757.82 on January 1, 1943, and $7,768 on November 3, 1943, or an increase of $6,010.18 plus cash withdrawals of $3,225 from the business for living expenses resulted in an adjusted net income of $9,235.18 from Stokes' business instead of the $2,557.82 reported on the return. For the year 1944 petitioners filed a joint return reporting a salary of $1,944.71 received by Mrs. Stokes from the Naval Supply Depot and a loss of $781.05 from Vene P. Stokes' business. Respondent determined that the difference between Stokes' bank balance of $4,541.40 on January 1, 1944, and $5,369.97 on December 31, 1944, or an increase of $828.57 plus cash withdrawals of $3,900 from the business for living expenses, resulted in an adjusted net income of $4,728.57 from Stokes' business instead of the loss of $781.05 reported on the return. For the year 1945 petitioners filed a joint return reporting a salary of $2,143 received by Mrs. Stokes from the Naval Supply Depot and "Commissions" *163 of $1,710. Respondent determined that the difference between Stokes' bank balance of $5,369.97 on January 1, 1945, and $13,238.83 on December 31, 1945 or an increase of $7,868.86 plus cash withdrawals of $3,900 from the business for living expenses, resulted in an adjusted net income of $11,768.86 from Stokes' business instead of the $1,710 reported on the return. Opinion The first issue presents the question of whether respondent erred in denying for each of the years involved herein a claimed credit for dependents as provided for by section 25(b) of the Internal Revenue Code, the pertinent parts of which, as amended and applicable to the year 1943 and as further amended and applicable to the years 1944 and 1945, are set forth in the margin. [1]
*164 Petitioners contend that they furnished the chief support for one grandchild during 1943 and for two grandchildren during 1944 and 1945 and thus meet the requirements of section 25 (b), supra. Respondent contends that petitioners have failed to establish sufficient facts to sustain their burden of proof on this issue. Although a definition of the term "dependent" was first embraced in the taxing statutes pursuant to section 25 (b) (3), supra, under the 1944 amendment of the Code, its meaning as embracing persons who receive over one-half of their support from the taxpayer has been one of long standing under the Commissioner's Regulations interpreting the earlier revenue acts and also under decisions of this Court. Harry Sommers, 32 B.T.A. 490; Eleanor L. Mack, 37 B.T.A. 1101; and Max Freedman, 43 B.T.A. 1181. See also Ollie J. Kotlowski, 10 T.C. 533, applying the 1944 amendment, supra. In the instant case the witnesses testified generally as to the circumstances of the petitioners' daughter-in-law and her two children and also to their conclusion that petitioners furnished the chief support for their grandchild, Kenneth, *165 during 1943 and for their grandchildren, Kenneth and Clerc, during 1944 and 1945. However, in our opinion, the record establishes only that petitioners contributed materially to the support of their two grandchildren, but there is no evidence as to the amount of such contributions nor as to the actual cost of the support and maintenance of Kenneth and Clerc during any of the three years involved. Thus there is no factual basis on which to draw our own conclusion as to whether petitioners furnished more than half of the amount expended for the support of those children who were at all times under the custody and care of their mother and lived in a home provided by her out of allotments received from their father. It is our opinion that petitioners are not entitled to the claimed credit for dependents in any of the taxable years. Petitioners cite the case of Albert Fleming, 4 T.C. 168, affirmed 153 Fed. (2d) 361 on another issue, as being directly in point. However, that case is distinguished on its facts in that there the grandfather provided the entire support and maintenance of two minor grandsons who had lived continuously with the grandfather from *166 the time of their mother's death. On this issue we hold that respondent did not err. The second issue involves the question of whether respondent erred in determining that petitioners had additional unreported income for each of the years 1943, 1944, and 1945 based on the increase in Stokes' net worth as reflected by his bank account plus cash withdrawals from his business for living expenses during each of those years. Petitioners contend that, except to the extent of the amounts reported on their tax returns as income from Stokes' business, all of the deposits in his bank account represented capital funds used in operating a race horse handbook and for cashing pay checks for customers and neighbors; that they did not withdraw from Stokes' business any amounts of unreported income used for living expenses and, in the alternative, that in any event their living expenses were substantially less than as determined by respondent; and that this is not a case where the petitioners failed to keep records from which their income could be determined and thus the respondent's determination is unreasonable. In many respects the testimony in this proceeding is far from unequivocal. In *167 finding that Stokes had a cash bank roll of approximately $5,000 on January 1, 1943, we have given him the benefit of doubts cast by the testimony as to the source of such funds which he testified were neither earned nor borrowed. However, irrespective of what the amount of the bank roll may have been on January 1, 1943, the record does not establish that from that date forward all deposits in Stokes' bank account were out of his cash bank roll and therefore did not embrace any items of income other than the amounts he reported on his returns. From this record we are unable to determine or even to approximate what portion, if any, of his cash bank roll was on deposit at any time during or at the end of each of the taxable years. On that point the testimony is conflicting in the following respects: That Stokes always carried a cash bank roll of $5,000 or $6,000 in his pocket; that the cash bank roll was constantly being worked in and out of the bank account through deposits and withdrawals in connection with bookmaking and cashing checks as an accommodation; that at times the bank roll was deposited to change his luck because all bookmakers are superstitious; that all of the bank roll *168 was deposited during the latter part of 1945 in order to make an accounting to Stokes' son who was in the Army and not in business with him, but who had been promised a share in the profits of the business while he was in the Service; that all of the bank roll was not on deposit on December 31, 1945, because a large amount had to be held out to meet expenses and because Stokes' business was still in operation; and that Stokes did not know how much of the bank balance of $13,238.83 on December 31, 1945, represented his cash bank roll. The bank statement introduced into evidence, and which covers the period from the time the account was opened on December 8, 1941, down through the taxable years, shows a very active account with numerous deposits and withdrawals in every month during that whole period and while the balances vary upward and downward from time to time, the gradual over-all trend is upward in amount. The bank account was opened, maintained, and consistently used in connection with Stokes' bookmaking business and therefore the net increases therein may properly be considered as of a taxable nature. Petitioners' contention that deposits of checks cashed for customers invariably *169 represented a deposit of portions of the bank roll used in cashing such checks is incomepatible with the fact that in general Stokes' bank balance was steadily increasing in amount and with the further fact that inevitably it must have been true that at least part of the time the cash on hand used to cash customers' checks consisted of winnings as well as bank roll money and, accordingly, to that extent the deposits would include winnings, that is, income. There is no satisfactory evidence of either the amount or an approximation of the petitioners' bookmaking expenses or living expenses during the taxable years in question. The fact that Stokes' records were stolen in February 1946 is unfortunate, but does not lessen petitioners' burden of proof in this proceeding. The meager testimony as to the nature of the records which were kept does not indicate that even if available they would be wholly adequate for the purpose of correctly showing Stokes' gross income, expenses and net income of his bookmaking business for the taxable years in question. In the absence of convincing evidence of error or of unreasonableness, the respondent's method of resorting to bank records and information *170 as to living expenses of petitioners as a basis for determining the amount of petitioners' taxable income, and thus the deficiencies involved in this issue, must be upheld. Russell C. Mauch, 35 B.T.A. 617, 625; affirmed 113 Fed. (2d) 555; Axel Holmstrom, 35 B.T.A. 1092; dismissed 94 Fed. (2d) 747; Leonard B. Willits, 36 B.T.A. 294; Manasse Karger, 38 B.T.A. 209, 214; dismissed without opinion, C.C.A. 5th Circuit, May 15, 1939; Joseph Calafato, 42 B.T.A. 881; affirmed 124 Fed. (2d) 187; Arthur M. Slavin, 43 B.T.A. 1100; dismissed 129 Fed. (2d) 325; and Estate of Robert Lyons Hague, 45 B.T.A. 104; affirmed 132 Fed. (2d) 775. We find no unreasonableness in the respondent's method or determination for the calendar years 1944 and 1945. However, with respect to the year 1943, his use of Stokes' bank balance of $7,768 on November 3, 1943, on a basis of an approximately ten months fiscal year instead of the balance of $4,541.40 on December 31, 1943, on a calendar year basis, is not supported by the record which shows that during November *171 and December 1943 withdrawals were made from the bank account in connection with Stokes' business to cover losses and other expenditures. In our opinion, the respondent's method of determining petitioners' income should be applied to a twelve months calendar year for the taxable year 1943 and should be modified accordingly. Decision will be entered under Rule 50. Footnotes
1. [Applicable to the taxable year 1943:] SEC. 25 CREDITS OF INDIVIDUAL AGAINST NET INCOME. * * *
(b) Credits for Both Normal Tax and Surtax. - There shall be allowed for the purposes of the normal tax and the surtax the following credits against net income: * * *
(2) Credits for Dependents. - (A) Allowance in General. - $350 for each person (other than the husband or wife) dependent upon and receiving his chief support from the taxpayer if such dependent person is under eighteen years of age or is incapable of selfsupport because mentally or physically defective. * * * [As amended by sec. 131 (b) and sec. 101, Rev. Act, 1942.] [Applicable to the taxable years 1944 and 1945]: SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. * * *
(b) Credits for Surtax Only. - (1) Credits. - There shall be allowed for the purpose of the surtax, but not for the normal tax, the following credits against net income: * * *
(C) A surtax exemption of $500 for each dependent whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $500, * * *
(3) Definition of Dependent. - As used in this chapter the term "dependent" means any of the following persons over half of whose support, for the calendar year in which the taxable year of the taxpayer begins, was received from the taxpayer: (A) a son or daughter of the taxpayer, or a descendant of either, * * * [As amended by sec. 10 (b) and sec. 2, Individual Income Tax Act of 1944.]↩